[Civ. No. 15647.   First Dist., Div. Two.   May 5, 1954.]

ISABEL ILLERS, as Administratrix, etc., Appellant, v. C. L. CRARY et al., Respondents.

Robert J. Popelka and Donkin & Mulholland for Appellant.

Dana, Bledsoe & Smith for Respondents.

DOOLING, J.—This is an appeal from a judgment of nonsuit entered in favor of defendants in an action brought pursuant to the Jones Act.   (46 U.S.C.A. § 688.)

Plaintiff is the former wife of deceased and brings this

action as administratrix on behalf of the sole beneficiaries of his estate. They are his two children, Eugene L. age 23 and Elizabeth Pollmann, a minor. The testimony of the plaintiff and Elizabeth is sufficient to establish the fact that there was pecuniary loss resulting to the beneficiaries from the death of their father so that they can recover under the statute. The plaintiff testified that deceased sent money to her twice a month without fail to help provide for the children. Elizabeth testified that her father sent $80 per month for her support and also sent various sums of money for different holidays and had promised to help her through college.

Deceased, Ferdinand Pollmann, worked as a deck hand on a tug boat for the defendants and at the time of his death by drowning he was working in such position on the tug boat "Ruth Freese." Beside deceased the crew consisted of Edward Jocz, the captain, and Manuel Santos, the assistant operator. The tug boat set out from Oakland on December 4, 1950, with a loaded tank barge in tow. They started out for Sacramento, proceeding by Rio Vista, and the Grand Island echo light. They had gone up the Sacramento River for about a mile, but the "Ruth Freese" did not have sufficient power to go any further. Therefore they went back to Rio Vista where the captain called the office for advice. The dispatcher sent down the "Oil Pilot," another tug boat, to give the "Ruth Freese" a hand. The two captains talked it over and decided to tow in tandem with the "Oil Pilot" in the lead followed by the "Ruth Freese" and last the barge. They took into consideration the fact that there was a heavy current in the river and that a heavy current was coming down Steamboat and Cash Sloughs. The two sloughs and Sacramento River all join together around the vicinity of the Grand Island light.

After leaving the docks the captain ordered the deceased to go to bed because he and the captain would take the second watch. Santos was standing the first four hour watch. The captain testified that the most treacherous spot to navigate is the mouth of the river where the two sloughs and the river join together. The river was at high water at the time, and the three converging streams create cross currents, whirlpools, etc., which are accentuated by the increased volume of water during the winter. The captain admitted that he delayed retiring until they had passed

through this area because it was more troublesome than any other.

The barge sheared to the left as the tugs were making a right turn into the river. The "Oil Pilot" moved over to counteract this, but the barge then sheared to the right. At this point this shearing force caused the "Ruth Freese" to turn over on its side so that the mast was lying in the water. The captain of the "Oil Pilot" testified that as the "Ruth Freese" was capsizing he saw a figure come out of the galley and run aft. This was the last seen of the figure, but he heard a "man holler for help."

Where a nonsuit has been granted it is well settled that this court must give the plaintiff's evidence all the probative value to which it is legally entitled and indulge in every legitimate inference which may be drawn from such evidence. Only when this is done and there is still no evidence of sufficient substantiality to support a verdict for the plaintiff, can the court affirm such a judgment. (*Raber* v. *Tumin,* 36 Cal.2d 654, 656 [226 P.2d 574].)

Plaintiff makes two contentions: (1) There was sufficient direct evidence presented to support an inference of negligence by the defendants; (2) under the facts presented the doctrine of res ipsa loquitur was applicable to establish a prima facie case. We are convinced that both points are well taken. The witness Holmes who was second in command on the "Oil Pilot" and Jocz, the skipper of the "Ruth Freese," were both examined by the plaintiff under Code of Civil Procedure, section 2055.

From their testimony it appears that there are other methods of towing a barge with two tugs beside hitching the tugs to the barge in tandem. One of these is to put one tug ahead of the barge and the other tug behind it. When a barge is being towed it has a tendency at times to shear off to the right or left. This shearing is corrected by the tug turning in the opposite direction to bring the barge back to its proper course. When two tugs are hitched to a barge in tandem and the barge shears off in one direction and the lead tug turns in the other the second tug has no maneuverability. It must follow the lead tug with its bow while its stern is subject to the pull of the shearing barge in the opposite direction. The following testimony given by Holmes points this up:

"Q. Mr. Holmes, it is a fact is it not, when you are towing in tandem, with one tug boat ahead of the other and the barge

behind, that the tow boat in the center . . . has no control over which way it is going to go? A. Yes.

"Q. In other words, if the barge shears off to the left, and this tug boat ahead is pulling, this one in the center can't turn to go with the barge? A. Not unless he turns with the other boat.

. . . . . . . . . . . . .

"Q. Yes. In a case where you have it hooked up in tandem, and the barge takes a shear off to the right or starboard, and the first boat continues on straight, what happens to the one in the middle? A. It follows the heaviest, the barge. . . . The barge will pull it over.

. . . . . . . . . . . . .

"Q. I mean does he have the same steering ability as the lead boat, or more or less? A. No, he doesn't have hardly any."

Holmes further testified as to what caused the "Ruth Freese" to capsize:

"Q. . . . On December 5, 1950, when you were on the Oil Pilot which was forward of the Ruth Freese, which was towing that barge, my question is: That is exactly what happened that night, didn't it, the barge took a shear off to the right that was great enough so that it tipped the Ruth Freese entirely over in the water, so that its mast was underwater? A. That is right.

"Q. And did you see that happen? A. Yes."

On the other hand Holmes testified that where one of the two tugs is behind the barge when the barge shears off the rear tug can shut off its power and remain clear of the barge until the lead tug has righted the barge.

It was also in evidence that both the Sacramento River and the two sloughs emptying into it were in flood, that the cross-current of the water from the sloughs against the side of the barge would force it to shear off to the right, that on previous trips during times of flood the effect of the current from these sloughs upon both tug and tow had been observed and that a loaded tank barge, such as the one under tow at the time, has a greater tendency to shear off than a barge loaded with dry cargo. Holmes also testified that while he had seen tugs hitched to a barge in tandem on the bay he had never before seen this done on the Sacramento River.

It is clear from this evidence that the jury could find that the skippers of the two tugs when they hitched them in tan-

dem to the barge knew the danger of the barge shearing off under the force of the cross-current created by the flood-waters of the two sloughs at the point of the casualty and knew or should have known that the danger of the "Ruth Freese" being capsized if this shearing off occurred was markedly increased by the fact that, as the second tug in the tandem, it would be in a position where no effective steps could be taken to counteract the careening effect of the lead tug pulling its bow in one direction while the barge pulled its stern in the other. Whether a person of ordinary prudence would have added to the hazards of the navigation by hitching the tugs in tandem with knowledge of all of the facts disclosed clearly presents a fact question for the jury.

It was also in evidence that an axe is provided on each tug to cut the tow rope when an emergency makes this necessary. Holmes testified as to the precautions taken on the "Oil Pilot" in passing through this hazardous part of the river.

"Q. And it is a fact, is it not, that it is the custom and practice when you get in waters that have severe currents, or real rough weather, to keep a man stationed back by the line to cut it if necessary, if something happens to it? A. Yes.

"Q. And you had a man stationed out on deck that night just in case of emergency at the time the accident happened? A. That is right."

It is further in evidence that this man on the "Oil Pilot" did cut the line from the "Oil Pilot" to the "Ruth Freese" when the "Ruth Freese" was seen to be capsizing. This presented a question of fact for the jury as to whether the failure of the skipper of the "Ruth Freese" to take a similar precaution, instead of instructing Pollmann to stay below as he did, was the act of a person of ordinary prudence under the circumstances. It is a fair inference from the evidence that Pollmann did in fact come from below and run to the stern of the "Ruth Freese" and loosen the tow rope to the barge, but too late to prevent its capsizing. This tow rope was in fact free of the "Ruth Freese" afterwards and the evidence is that unless it was freed manually this was unlikely to occur. The jury might well find that if Pollmann had been stationed on the deck, as was the deck hand on the "Oil Pilot," instead of being below decks, he might have reached the tow rope in time to cut or free it before the

"Ruth Freese" capsized. Other theories of liability under the evidence are suggested by appellant but the two above discussed sufficiently demonstrate the error in granting the nonsuit.

On the question of res ipsa loquitur it is in evidence that tugs with tows navigated this point in the Sacramento River in all weathers without casualty. The "Oil Pilot" alone had taken a heavier barge to Sacramento on the same day that this casualty occurred and on the following day towed this very barge to Sacramento without any untoward incident. The two tugs and the barge were exclusively in the control of defendants through their employees. The capsizing of the "Ruth Freese" under these circumstances falls fairly within the res ipsa rule. (*Raber* v. *Tumin, supra,* 36 Cal.2d 654, 659.)

The fact that appellant introduced affirmative evidence tending to show specific acts of negligence does not prevent the application of the res ipsa doctrine. (*Leet* v. *Union Pac. R. R. Co.,* 25 Cal.2d 605, 622 [155 P.2d 42, 158 A.L.R. 1008].)

Respondents also urge that navigation is such an expert field that only expert evidence would support the application of the res ipsa doctrine. If this were to be conceded, the evidence above summarized from experts in the field, furnishes a sufficient basis for a jury to conclude that in the absence of negligence a tug boat under the circumstances here present would not ordinarily capsize.

Judgment reversed.

Nourse, P. J., and Kaufman, J., concurred.